IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

JUNE 1996 SESSION

FILED

July 23, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9304-CR-00071 |
| | ) | |
| | ) | Shelby County |
| v. | ) | |
| | ) | Honorable L. T. Lafferty, Judge |
| | ) | |
| DARRON CLAYTON, | ) | (Second Degree Murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Thomas E. Hansom_____
659 Freeman
Memphis, TN 38122
(AT TRIAL)


Darron Clayton, Pro Se
Lake County Regional Prison
Route 1, Box 330
Tiptonville, TN 38079
(ON APPEAL)

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
William David Bridges
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493


John W. Pierotti, Jr.
District Attorney General
        and
Chris B. Craft
Terrell Harris
Assistant District Attorneys General
201 Poplar Avenue
Memphis, TN 38103-1947

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Darron Clayton, appeals as of right from his conviction by a jury in the Shelby County Criminal Court for second degree murder, a Class A felony. He received a Range I, twenty-year sentence for the conviction.  He contends that:

(1) there is insufficient evidence to sustain his conviction;

(2) the state and the medical examiner violated the defendant's constitutional rights by failing to comply with T.C.A. § 38-7-101;

(3) the trial court erred by failing to instruct the jury as to criminally negligent homicide;

(4) the trial court improperly enhanced his sentence; and

(5) he received the ineffective assistance of counsel at trial.

We affirm the judgment of the trial court.

The defendant was convicted of killing his girlfriend, Phyllis Johnson, on January 27, 1992.  In response to a 9-1-1 call by the defendant, emergency personnel arrived at the defendant's house and found the victim lying unconscious in a hallway. The medical examiner testified that the victim died as the result of multiple blunt force injuries.

At trial, Katonya Moore, the victim's eighteen-year-old daughter, testified that at the time of the victim's death she lived with the victim and the victim's then one-year-old son.  However, she said that the victim stayed with the defendant at his home for two weeks before her death.  Ms. Moore said that on the Saturday morning before the victim's death, January 25, 1992, the defendant brought the victim home.  She said that she heard the victim tell the defendant that he made her feel like leaving town.  Ms. Moore said that the defendant replied, "Girl, if you leave, I'll kill you." Ms. Moore stated that the victim stayed home all day Saturday and Sunday and that the defendant called the victim several times on both days.  Ms. Moore said that she and a couple of friends

2

dropped off the victim at a club, the Chelsea Inn, at around 11:00 p.m. on Sunday, January 26. At the time, the victim wore black jeans, boots, and a leather jacket.

Ms. Moore testified that her mother called her once from the Chelsea Inn and called her again at 2:30 a.m. on Monday morning. She said that the victim's voice trembled during the second call and that the victim sounded scared. Ms. Moore said that the victim told her that she was at the defendant's father's house and that she was okay. Ms. Moore said that she asked the victim whether she should call the police and that a strange man's voice told her that the victim did not need her to call the police. Ms. Moore said that the defendant then got on the phone and said, "Katonya, I'm telling you, you better not put them white folks in my business or you're going to have trouble." Ms. Moore testified that she called the police, but the police told her that they could not go to the defendant's father's house because she was not sure that the victim was there. Ms. Moore said that she never heard from the victim again.

Ms. Moore testified that in the past she noticed that the victim had bruises on her legs and arms and busted ear drums after she had stayed with the defendant. She said that the victim had to go to the hospital for her prior injuries. On cross-examination, Ms. Moore admitted that she never saw the defendant act violently toward the victim. Ms. Moore also explained that her seventeen-year-old friend, Taneka Blackwell, stayed with her and her younger brother for the two weeks that the victim stayed with the defendant. She said that she and the victim talked frequently on the phone during the two-week period.

Taneka Blackwell testified that she was at the victim's home the Saturday morning before the victim's death. She said that she heard the victim tell the defendant that she was going to leave town and heard the defendant threaten to kill the victim if she left. Ms. Blackwell said that the victim stayed home all day Saturday. She said that

3

the victim did not leave the house until around 11:00 p.m. on Sunday, when she went to the Chelsea Inn. Ms. Blackwell testified that the defendant called the victim several times on Saturday and Sunday.

Ms. Blackwell testified that she talked to the defendant when he called the victim's home Sunday night after the victim had gone to the Chelsea Inn. She said that the defendant asked where the victim was and that she told him that the victim was asleep. She said that the defendant told her to wake up the victim and that she told him that the victim would not wake up. Ms. Blackwell said that the defendant called back five minutes later but that she did not speak to him. Ms. Blackwell testified that she was listening in on the phone when the victim called at 2:30 a.m. She said that she heard Ms. Moore ask the victim if she should call the police. She heard another man order Ms. Moore not to call the police and then heard the defendant say, "Don't put them white folks in my business or you'll have trouble."

During cross-examination, Ms. Blackwell testified that the defendant and victim arrived at the victim's home at around 8:00 a.m. on the Saturday before her death. Although she testified that she was watching the television and talking with Ms. Moore when she heard the defendant threaten the victim, in a statement she gave police she said that she had been sleeping and heard the threat when she got up to use the bathroom. Ms. Blackwell also testified that the defendant had given her a ride to the victim's house and had given Ms. Moore money in the past.

Linda Sanders testified that she and the victim sat together at the Chelsea Inn. She said that the victim arrived at the club at around 10:00 or 11:00 p.m. on January 26, 1992. She stated that at one point, the victim quickly left the table where they were sitting and entered the kitchen. Ms. Sanders said that the defendant entered the club and asked her whether she had seen the victim. Ms. Sanders testified that she

4

told the defendant that she had not seen the victim and that the victim was not in the club or the bathroom. She said that the defendant looked toward the bathroom, and she opened the door to the bathroom. She testified that the victim came out of the kitchen after the defendant left the club.

Ms. Sanders testified that she and the victim left the club together. She said that they were walking toward her car when a car pulled up and quickly stopped behind them. She said that the defendant and another man got out of the car. She stated that the defendant grabbed the victim, and they struggled. She said that the defendant eventually threw the victim into the car, and the car drove off. Ms. Sanders testified that her sister-in-law, who was also in the parking lot, called the police. She admitted that her sister-in-law lied to the police about her name.

Although Ms. Sanders testified that the victim acted scared and that she lied to the defendant about the victim's presence in the club because the victim was frightened of him, she admitted that she had given a previous statement saying that the victim acted normal that night and that she did not have any reason to lie to the defendant. Ms. Sanders testified that the defendant was in a gray Buick Regal, similar to a photograph of the defendant's mother's car that was introduced into evidence. However, she admitted that in a prior statement she said that she could not identify the car or its color. Ms. Sanders testified that immediately after the victim was forced into the car, the car drove off with the victim's boots and legs hanging out of the door. Ms. Sanders said she heard a gunshot, but she did not see a gun.

Officer James J. Wilkins, a supervisor with the Communications Bureau of the Memphis Police Department, testified that 9-1-1 received a call from a phone near the Chelsea Inn at 12:56 a.m. on January 27, 1992. He said that the caller identified herself as Gwen Jackson and reported that someone had been forced into a car. The

5

caller said the license plate number of the car was DV 4164, the same license plate number that was on the defendant's mother's car in the photograph that was introduced into evidence. A tape recording of the call was played for the jury.

Linda Sanders' sister-in-law, Nina Sanders, testified that she saw the victim at the Chelsea Inn at around 8:30 or 9:00 p.m. on January 26, 1992. She said that the victim appeared to be upset and afraid. She stated that she saw the victim run into the kitchen before the defendant entered the club. She watched the defendant approach Linda Sanders, and heard the defendant ask her whether she had seen the victim. Nina Sanders said that Linda Sanders opened the bathroom door and that the defendant looked into the bathroom and then left the club. She said that fifteen or twenty minutes later, she, Linda Sanders, and the victim were walking toward their cars when the defendant and another man drove up. She said that the defendant ordered the victim to "come here," and the victim screamed, "No" and began running around the car. She said that the defendant ran after the victim and hit her. The victim started running again, and the man who was with the defendant hit her. Nina Sanders testified that the victim was pleading for help while she was running from the defendant. The defendant eventually pulled the victim by her coat and dragged her into the car. Nina Sanders said that she heard a gunshot when the defendant got the victim into the car and that she saw the defendant with a gun. She explained that the man who was with the defendant drove the car as it left with the victim's feet hanging out of it. She said that she called the police but lied about her name because she was scared.

During cross-examination, Nina Sanders testified that the victim arrived at the club between 8:00 and 9:00 p.m. She said that she saw the police arrive at the pay phone she used but that she did not talk to them. She also described the gun the defendant had as having a silver handle and said that she heard the victim shout that the defendant was going to kill her.

6

Lieutenant Ronald L. Huffman, a communications commander with the Shelby County Sheriff's office testified that 9-1-1 received a call from the defendant's address at 11:10 a.m. on January 27, 1992. A tape of the call was played for the jury. The defendant is heard on the tape telling 9-1-1 personnel that he is waiting for an ambulance because he thinks the victim is dead. Medic personnel on the tape explain how to check for the victim's pulse and how to perform coronary pulmonary resuscitation (CPR).

Officer Eugene Campbell with the Shelby County Sheriff's Department testified that when he arrived at the defendant's address at 11:18 a.m. on January 27, 1992, medical personnel and firemen were working on the nude victim in a hall. He said that he saw the defendant at the scene and saw what appeared to be bloodstains in the bathtub and on bed wear in the laundry room. Officer Campbell also testified that the defendant's sister arrived at the defendant's house with two other men after the defendant left.

Officer Earl Quinton Perry of the Shelby County Sheriff's Department testified that he arrived at the scene while medical personnel were working on the victim. He said that he noticed furniture out of place and what appeared to be blood in a bedroom. He explained that the bed and dresser in the room were pulled away from the wall and that the sheets were pulled away from the bed. Officer Perry said that he drove the defendant to the police station. During the ride to the station, the defendant asked whether he was going to be charged with murder. Officer Perry said that he told the defendant that he was unaware of any charges against the defendant and that he was taking the defendant to the General Investigative Bureau (G.I.B.) office for further investigation. Officer Perry said that the defendant told him that he had been in a fight

with his girlfriend earlier that day and that he wanted to know whether he was going to be charged with murder and if so, what degree of murder.

Ronald Goodwin, a lieutenant in the Detective Division of the Shelby County Sheriff's Department, testified that the victim was not at the scene when he arrived. He said that he read the defendant his rights and placed him under arrest for the victim's death. He stated that the defendant told him that nothing the defendant had done could have killed the victim.

Lieutenant Goodwin explained a videotape and several pictures of the defendant's house that were introduced into evidence. He said that the defendant's patio had various degree of wetness and that a foot rug on the patio was wet underneath and appeared to have bloodstains on it. He said that he found a pistol in the backyard inside a plastic bag under the hood from a coat. He said that although the yard was damp, the hood, bag and gun were dry. The basketball court in the defendant's back yard had muddy footprints on it. Lieutenant Goodwin said that a black hat in the yard was dry but that the ground where the hat was located was damp. There was also a dog kennel in the back yard.

Lieutenant Goodwin said that when he entered the door from the patio into the defendant's bar room he found a muddy floor with drops of what appeared to be blood. He described dry muddy shoes he found in the house and spots on carpet inside the house that appeared to be bloodstained. There was a phone off of the hook in the defendant's weight room and small stains on the carpet. The master bedroom had a bloodstained bandage on the floor and a bloodstained mattress cover on the bed. One of the metal bars on the bed frame was broken at the foot of the bed. Lieutenant Goodwin testified that the carpet and a chair in the master bedroom appeared to have bloodstains on them. The stains on the carpet appeared to have been wiped, and the

8

stains on the chair were in the place that a person's leg would hit if the person was sitting in the chair. Lieutenant Goodwin found bandages on the television in the master bedroom.

Lieutenant Goodwin testified that he found more bloodstains in the master bathroom. He said that there were stains on the floor that appeared to have been wiped, stains on a first-aid kit on the vanity, and stains on items in the first-aid kit. Lieutenant Goodwin said that there were two wet washcloths in one of the master bathroom sinks and another wet washcloth in the other sink. He also saw a pair of black pants with panties in them on the floor in the master bathroom.

In the room he called bedroom number three, Lieutenant Goodwin collected bloodstained sheets from the bed, a wet washcloth from the dresser, and a bloodstained pair of underwear-type shorts that he found under the covers of the bed. The sheets, washcloth, and shorts were introduced into evidence. In the laundry room, Lieutenant Goodwin collected bloodstained sheets and a comforter from the floor and bloodstained sheets and a comforter from the washing machine. In a bathroom at the end of the hall where the paramedics worked on the victim, Lieutenant Goodwin saw what appeared to be bloodstains on the tub drain. A photograph of the drain was introduced into evidence.

Lieutenant Goodwin testified that after he examined the hall bathroom, he entered a bedroom that he referred to as bedroom number two. The bed in bedroom number two did not have any bed clothing on the bed but had a bloodstained plastic covering the mattress. Lieutenant Goodwin said that he collected a pair of socks from behind the door and a towel from the floor. He described the socks as being badly-soiled, white crew socks with several small spots on them. Lieutenant Goodwin

9

testified that he found the coat that the victim wore to the Chelsea Inn on a chair in the den.

Lieutenant Goodwin testified that as he was leaving the defendant's house, he noticed a car that matched the description given during the 9-1-1 call from the phone near the Chelsea Inn. He said that he verified the car's tag number, and then seized it.

During cross-examination, Lieutenant Goodwin admitted that he did not videotape several rooms and closets in the defendant's house. He stated that he saw women's clothes, handbags, and shoes in a bedroom closet and that he did not check the sizes of the clothes. He said that he also did not check the size of the muddy tennis shoes he found inside the house. He said that he did not remember seeing any furniture that was clearly out of place in the house.

Lieutenant Goodwin testified that he was unable to find any fingerprints on the gun that was found in the defendant's yard. He said that the defendant's hands were tested to determine whether he had recently fired a gun. However, Lieutenant Goodwin said that he chose not to send the tests to the lab because he did not believe that the results would have been reliable based on the amount of time that had passed before the test was administered.

Lieutenant Goodwin testified that there were two glasses on the defendant's bar but that he did not dust them for fingerprints. He said that he also did not try to lift fingerprints from the washing machine, the hydrogen peroxide bottles that were found in two of the bedrooms, or the first-aid pack. Lieutenant Goodwin said that he neither looked for nor found any broken glass in the house.

10

Ronald Ragghianti, a former officer with the General Investigations Division of the Shelby County Sheriff's Department, testified that he viewed the victim's body at the Shelby County Medical Examiner's office. He said that the victim had what appeared to be a belt buckle impression and a chain impression on the left side of her chest. He said that he obtained a search warrant for the defendant's house where he confiscated three belts, two exercise belts, two pieces of chain, and a small baseball bat. He stated that he only searched the garage and lower level of the house. He said that he did not recall looking inside the closet in the master bedroom. He admitted that he did not secure the evidence in an evidence bag, although he had been trained to do so.

Bobbie Stacks, a forensic serologist with the University of Tennessee in Memphis, testified that she went to Graves Wrecker Service on February 4, 1992, and examined the defendant's mother's 1981 Grand Prix. She said that she collected several loose items from the car including two shoes, a towel, a hat, a belt, and a broken blade of some type. She explained that she collected the items for further testing because they appeared to be stained or to have possible body fluids on them. She said that she also cut out three stains from the front seat and an area of the seat that was not stained.

Paulette Sutton, the supervisor of Forensic Serology at the University of Tennessee toxicology lab, testified that she went to the defendant's house on January 27, 1992. She said that there were Type O bloodstains on the patio step to the defendant's house, on a rug on the patio, and on the wood floor in the bar area of the defendant's house. She explained that some of the stains in the bar area were a bit smeared, as if something had moved across them while they were wet. She said that the left side of the foot of the recliner in the master bedroom had human blood on it but that she could not determine the blood type.

11

The parties stipulated that the medical supplies, sheets, washcloths, comforters and towels that were collected from the defendant's house had the victim's blood on them. They stipulated that the victim's blood was on the carpet in the hallway where she had lain and that the victim's blood may be present below the knees of the black jeans found at the defendant's house.

Ms. Sutton testified that she analyzed bloodstain patterns in various rooms of the defendant's house. With respect to the master bedroom, she testified that there were multiple stains on the floor. She said that a bloodstain pattern on the floor near the door leading to the master bathroom was consistent with a bloody, single-edge knife coming in contact with the floor. She explained that the stain displayed the curve of the blade side and the back side. Ms. Sutton said that she noticed faint stains on the floor of the master bathroom that were consistent with bloodstains that had been diluted. She said that a washcloth in the bathroom had a large amount of green lint on it that was consistent with a carpet sample from the hallway.

Ms. Sutton testified that she found a stain in the hallway close to the door of the hall bathroom. In the hall bathroom she saw stains on a bath mat in front of the vanity, stains on the floor, and in the tub. She explained that there were some "swiping" stains on the edge of the bath tub, indicating that there was movement across the surface after something bloody had come into contact with it. She said that the stains near the drain were positioned as if there was water in the tub and someone released the stopper.

Ms. Sutton testified that the fitted sheet that was on the bed in bedroom number three had bloodstains in the lower right corner. She said that some of the stains overlapped, indicating a possible time lapse or movement of the bloody object. She said that the stains contained linear patterns and explained that they were

12

consistent with movement or dragging of the bloody object toward the bottom of the bed.

Ms. Sutton also tested several items that had been taken from the laundry room. She said that a green comforter taken from the laundry room had linear stains on it. She said that the stains originated on the inside of the comforter and were very faint, indicating that they had been diluted. She said that a second comforter taken from the laundry room also had stains on it that had originated on its interior side. She testified that a fitted green sheet taken from the laundry room had stains on one end of it extending from side to side. She explained that the sheet had some swiping stains and that some of the stains had linear borders. Ms. Sutton testified that she did not find any blood on any of the pillowcases.

Ms. Sutton testified that the boxer shorts that were found in bedroom number three had the victim's blood on them. She explained that there were several areas of staining on the front of the shorts but that the staining was limited to the waste band on the back of the shorts. She said that the majority of the stains originated on the outside of the shorts but that a few stains could have originated on the inside of the shorts. She said that the stains on the shorts had been diluted. With respect to the socks collected from bedroom two, Ms. Sutton said that they were dirty with bloodstains on top of the dirt, indicating that the socks were soiled and then the individual wearing them traveled through blood.

Ms. Sutton tested the items taken from the defendant's mother's car. She testified that one cutting from the front seat tested positive for human blood that was consistent with Type O blood. She said that a towel recovered from the backseat tested positive for blood but that she was unable to determine the species from which the blood came. She said that two cuttings from the front seat of the car, a belt, a left

shoe, and a hat screened positive for blood but that she was unable to confirm that the substance on the items was blood. A right shoe and a blade taken from the car screened negative for blood.

During cross-examination Ms. Sutton testified that forty-seven percent of the population have Type O blood. She said that she did not know how long the bloodstain had been in the car before it was collected. She stated that time is of the essence when conducting tests for blood. Although the crime occurred on January 27, 1992, she said that the items were not collected from the car until February 4, 1992, and that she did not test the items until September 2, 1992. She explained that the seven-month delay in testing the items was due to a backlog and an individual from the sheriff's department telling her that she did not need to process the evidence.

Ms. Sutton testified that she received bed sheets, towels, socks, pillowcases, washcloths, a pair of jeans and other items taken from the defendant's house on March 3, 1993, fourteen months after she had visited the crime scene. She described the jeans as having cuts below the knee. She said that all the sheets taken from the defendant's house had blood on one end of them and that the mattresses were stained at the end of the bed. She explained that some of the stains on the sheets were consistent with someone lying in bed with a bleeding foot and moving it. She said that she did not do any tests to determine whether first aid had been administered to the victim before the stains on the bed were made. She said that there is no way to determine whether someone bled directly onto sheets or through gauze.

Dr. Violette Hnilica, a forensic pathologist with the Shelby County Medical Examiner's office, testified that she conducted an autopsy of the victim. She determined that the victim died as the result of multiple blunt force injuries. She said that the victim had a blood alcohol content of .02 percent at the time of her death. Dr.

Hnilica explained that the victim was not intoxicated, and she said that she did not find any other drugs in the victim's system. Dr. Hnilica said that the victim had Type O blood.

Dr. Hnilica explained photographs she had taken of several of the victim's injuries. She said that the victim had several extensive contusions on the trunk of her body. She said that the victim suffered extensive deep bruising and deep hemorrhaging under the bruised areas. She said that the most extensive hemorrhaging was in the victim's arms but that there was similar hemorrhaging in the upper part of the victim's legs.

Dr. Hnilica explained that much of the deep bruising did not have any specific pattern but that she did recognize eleven specific patterns that formed a minor part of the victim's injuries. She identified a donut-patterned area and several semicircular patterns on the victim's mid-trunk and upper abdomen area. She explained that the semicircular patterns were pinkish with a superficial abrasion pattern and a deep contusion. The victim had a belt-buckle-shaped scar and a bruise that was made by a rod-shaped object similar to a broom handle on her abdomen. Dr. Hnilica testified that the victim also suffered extensive bruising on her back and that she had two rod-shaped patterns on the left side of her mid-back area.

With respect to the victim's lower body, Dr. Hnilica testified that the victim had extensive bruising in the upper thigh area, around her knees, shin, and calf areas and extending down to her feet. The victim had a semicircular cut on her left big toe, an abrasion on her left ankle, a cut on the edge of her right foot, and cuts on both of her legs. Dr. Hnilica said that the cuts in the victim's jeans generally coincided with the cuts on her body. She said that a cut on the victim's left leg was one-half inch in breadth and one-and-a-half inches deep. A cut below the victim's right knee was three-fourths

15

of an inch in breadth and one inch deep. Dr. Hnilica said that the cut below the victim's right knee went to the bone and that it had very specific characteristics of a knife-type wound. Dr. Hnilica said that the cut on the victim's left leg was also characteristic of a stab wound. She said that she could not tell the order in which the victim's injuries occurred but that the wound on the right leg had characteristics indicating that it was inflicted hours before the victim's death. She explained that the stab wounds did not cause the bruising behind and around them. Instead, a blunt force, pressure-type injury caused the bruising behind and around the cuts.

Dr. Hnilica testified that the victim's arms showed bruising and swelling and that both of the victim's arms were broken with multiple fractures. Specifically, she said that the ulna bones in the victim's arms were broken and that the ulna bone in the left arm was totally displaced from its joint. She noted that the victim did not have any broken fingernails or blood under her fingernails and concluded that there was no evidence that the victim was trying to defend herself when the injuries to her left arm occurred. Dr. Hnilica explained that the fractures, bruising, and hemorrhaging into the arm muscles would have been very painful to the victim, making it unlikely that the victim would have lowered herself into a bathtub an hour after sustaining the injuries. Dr. Hnilica said that the pain the victim felt from the deep bruising in her arms would have progressively increased as the swelling in her arms increased.

Dr. Hnilica also testified that the victim suffered three fractured ribs and a one-inch tear in the back of her liver. She said that the tear in the victim's liver was three-fourths of an inch deep and could have been inflicted by the injuries that caused the bruising on the victim's back. She estimated that the injury to the victim's liver occurred at least four hours before the victim's death. Dr. Hnilica testified that she would not expect a person with the victim's injuries to be conscious nine hours after the injuries were inflicted.

During cross-examination, Dr. Hnilica admitted that a form she reviewed before she examined the victim states, "This case is reported to be a very important case per A.G.'s office. This suspect is most wanted." Dr. Hnilica stated that the buckle-shaped scar on the victim was probably more than two weeks old and could have been several years old. She said that the scar did not perfectly match any of the buckles from the belts that had been introduced into evidence. Dr. Hnilica explained that she did not x-ray the victim's ribs because she could see them when she opened the body. She estimated that the rib fractures occurred within hours of the victim's death. She said that at most the fractures occurred a day or two before the victim's death.

Dr. Hnilica testified that the stab wounds on the victim's legs could have been caused by broken glass, but she said that the cut on the victim's right leg was most likely not caused by glass because it had a hilt mark, signifying the dull edge of a single-edged blade. She said that glass likely caused the victim's other cuts. However, she did not find any glass fragments in the leg wounds. Dr. Hnilica testified that the victim had three marks on her right arm that were not as old as the cut on her right leg. She said that the marks would have bled when they were fresh. Dr. Hnilica testified that to her knowledge none of the wounds were examined for evidence of first-aid cream or hydrogen peroxide.

Regarding the victim's face, Dr. Hnilica testified that the victim had a contusion on her cheek bone and one on her forehead. However, the victim did not have any broken teeth or any injuries indicating that she had been struck across the mouth.

Dr. Hnilica explained that she could not determine the time the tissue damage occurred in this case because blood was not drawn from the victim while she still had vital signs. She said that none of the victim's injuries would have caused

17

immediate or sudden loss of consciousness, but the victim would have gradually lost consciousness. Dr. Hnilica testified that falling into a bathtub could cause bruising or fractures and that she could not say that any portion of the victim's bruises were not caused by her falling into the bathtub. However, she said that she could not imagine how the victim's arm fractures could have been caused by her falling into the bathtub because in her opinion the fractures were caused by forces applied perpendicular to the bones. Although Dr. Hnilica stated that a wound on the victim's leg could have been caused by falling into the bathtub, she said that it was not likely.

Dr. Hnilica testified that the rod-shaped bruises on the victim's back were pinkish, indicating that they were quite recent. She said that an ambulance gurney usually has metal bars on the side of it that are similar to the size of a broom handle. She also testified that a bruise on the inside of the victim's wrist was made within hours of the victim's death. Dr. Hnilica stated that she had not been told how the victim was removed from the bathtub or how the victim's body was handled before she received it.

Christopher Thornton testified for the defense. He said that he was across the street from the Chelsea Inn in a fairly well-lit area talking to a friend during the early morning hours of January 27. He said that he saw a man order a woman to get into a car in an authoritative tone. He said that the woman got into the car after the man ordered her to do so a second time. He said that he was not paying much attention but that he did not see anyone throw the woman into the car. He said that the entire incident lasted a minute or two. After the car drove off, he heard a car backfire or a gunshot. He said that he heard the sound a few seconds after the car passed him and that he did not think that the sound came from the same direction in which the car was traveling.

18

During cross-examination, Mr. Thornton said that he did not remember telling an investigator that the backfiring sound that he heard came from the area the car had just left. He reiterated that he was not paying much attention, but he said that when he glanced up he saw the woman and man entering the car on the passenger's side.

Fred Nesbit testified that he had known the defendant all of the defendant's life. He said that he saw the defendant at a store at around 12:50 a.m. or a little after 1:00 a.m. on January 27. He said that a heavyset lady who wore boots, pants, and a jacket accompanied the defendant. He said that the lady smiled at him, and he noticed that she had gold teeth in her mouth. Mr. Nesbit testified that the lady had her side turned toward him and that she seemed like she was trying to kiss the defendant. He said that the defendant was not using a shopping cart.

Milton Hubbard, Jr., testified that he and the defendant have been friends for fifteen years. He said that he knew the victim as the defendant's fiancé and as the mother of the defendant's son. He said that the defendant called him at around 1:00 a.m. on January 27 and asked him to help the defendant drop off the defendant's mother's car. Mr. Hubbard said that the drive between his and the defendant's house takes around forty minutes. He arrived at the defendant's house between 2:00 a.m. and 2:15 a.m. and went into the den area. He said that he heard the victim's voice and saw her shadow. He said that he waited in the den for about fifteen minutes before he and the defendant took the defendant's mother's car to her house, which was less than twenty minutes away. Mr. Hubbard said that after they dropped off the defendant's mother's car, the defendant rode with him to Mr. Hubbard's home. Mr. Hubbard said that he and the defendant watched videos and talked. He said that he eventually took the defendant to the defendant's house. He said that the defendant arrived home at around 7:00 a.m or 7:10 a.m.

19

During cross-examination, Mr. Hubbard explained that the defendant and victim were in the master bedroom for the fifteen minutes that he was waiting for the defendant in the den. He said that he heard the defendant and the victim mumbling but that he could not tell whether they were arguing. Mr. Hubbard said that the defendant indicated that he and the victim had a fight but that the defendant did not say anything about hitting the victim.

Calvin Harris testified that he is a very close friend of the defendant and was a frequent visitor to the defendant's home before the victim's death. He said that his cousin lived with the defendant for about a year and that the victim also lived with the defendant "off and on." Mr. Harris stated that he went to the defendant's residence on January 27, 1992, to take his cousin to school. He said that he arrived at the defendant's home between 6:40 a.m. and 6:50 a.m. He said that he knocked on the back door, and his cousin opened it. He said that he went upstairs where his cousin and the defendant's son were getting ready for school. He said that when he returned downstairs he noticed bloodstains on the floor in the hallway. He said that he called out to the victim and asked her if everything was okay and that she told him it was. He said that he knocked on the door of bedroom number three and opened it. He saw the victim lying in bed on her back with a blanket over her. He testified that he asked the victim where the defendant was, and the victim replied that he was gone.

During cross-examination, Mr. Harris testified that he did not see any blood in bedroom number three. He said that he did not ask the victim about the blood or whether the defendant was okay. He stated that he did not see the defendant at the house that morning. He said that he did not go into the master bathroom, master bedroom, laundry room, weight room, or big bathroom but that he did look into bedroom number two.

20

Calvin Harris' cousin, Stephanie Sykes, testified that she lived with the defendant for two years. She said that the defendant never married her mother but that she considered the defendant to be her stepfather. She said that she was living with the defendant at the time of the victim's death, and her bedroom was upstairs over the master bathroom and the master bedroom. Ms. Sykes testified that the victim stayed with the defendant from time to time and had clothes at the defendant's house. She said that Calvin Harris picked her up for school at around 6:50 a.m. on January 27, 1992. She said that she saw Mr. Harris as she was coming downstairs and that she did not go back upstairs after Mr. Harris' arrival. She said that she saw Mr. Harris go into the kitchen, but she did not hear him talk to anyone. She said that she went outside while Mr. Harris was going toward the back bedroom. She testified that she did not see the defendant that morning or the white truck the defendant usually drove. She said that she saw blood in the hallway that morning, but she was not concerned because she did not know that it was blood. She also identified a pair of muddy shoes that belonged to the defendant.

The defendant testified that he had known the victim for six years at the time of her death. He said that the victim was his girlfriend and that she had given birth to his child. He said that the victim had planned for him to pick her up at the Chelsea Inn on January 26, 1992. He said that he arrived at the Chelsea Inn and talked to Linda Sanders who told him that the victim was not there. He said that he told Ms. Sanders to tell the victim to call him at his mother's house. The defendant said that he went to his mother's house, and his mother told him that the victim had called. The defendant stated that he stayed at his mother's house for over an hour and then borrowed her car because his truck had a flat tire. The defendant said that he drove the car to a friend's house and returned to the Chelsea Inn with his friend, Skeet.

When he returned to the club, the defendant saw the victim and Linda Sanders walking toward a car. He testified that he was not pleased that the victim was at the lounge that night, and he admitted that he used a somewhat authoritative tone when he ordered her to get into the car. The defendant denied threatening to kill the victim, denied having a gun that night, and denied struggling with the victim in the parking lot. He said that neither he nor Skeet hit the victim. He said that Skeet drove him and the victim to Skeet's mother's house. The defendant said that after they dropped off Skeet, he and the victim went to a store to buy some drink mix and then went to the defendant's house.

The defendant testified that he and the victim went into the master bedroom. He identified a photograph of the closet in the master bedroom and explained that it had the victim's purse, clothes, high heel shoes, and boots in it. The defendant said that he and the victim were in the house for fifteen or twenty minutes when they began to argue about money that the victim claimed she owed someone at the club. The defendant said that the victim was also upset because he was going to leave to return his mother's car. The defendant stated that he and the victim argued in the master bathroom and that the victim threw a glass ashtray and something else at him. The defendant said that the victim hit him, and he threw her to the floor. He said that he kept throwing her down, and she kept getting back up. He said that he went to the floor with her twice during the scuffle. The defendant admitted that he may have squeezed the victim, and he admitted that he grabbed her by her arms, wrists, and forearms. The defendant said that the fight lasted about a minute and ended with the victim calming down and the defendant releasing her.

The defendant testified that the victim went into the master bedroom to change clothes. He said that he returned to the master bathroom after the victim had put on one of his shirts and a pair of his pajama shorts. He said that he and the victim

22

argued again. He denied striking the victim but admitted that they had body contact and that he grabbed her. He said that the victim kept trying to hit him and that he slung her to the floor several times. He said that he also may have fallen on top of her during the fight. He denied striking the victim with his fist or any other object. He explained that he was not fighting the victim but only trying to hold her back. The defendant testified that the second altercation lasted two or three minutes. He said that the fight stopped when he saw that the victim was bleeding as the result of her feet and knees being down on the floor in the glass.

The defendant said that he used first-aid kits, towels and washcloths to stop the bleeding. He said that he eventually bandaged all of the victim's wounds, and he believed that the bleeding had stopped. The defendant testified that he, the victim and the two children were the only people in the house during the altercations.

The defendant testified that once the bleeding stopped, he and the victim had a couple of drinks. He identified a photograph of the bar in his house with drink mix and two glasses on it. The defendant said that blood may have been at the mat near the doorway leading to the patio because the victim walked toward the door looking for her purse or something. The defendant said that he went to the car to look for the victim's purse but never found it.

The defendant testified that he received a page from the victim's daughter. He said that he called the victim's daughter, and he and the victim talked to her and a friend that was with her. However, he denied hearing a strange man's voice on the phone and denied telling her not to get the police involved in his business. He said that he tried to subpoena the friend that was with the victim's daughter that night but that he could not find him.

23

The defendant testified that he called Milton Hubbard to help him drop off his mother's car. He explained that he asked the victim to ride to his mother's house with him, but she declined. The defendant said that he does not know what time he called Milton Hubbard, but he is certain that he did not call Mr. Hubbard at one o'clock. The defendant said that when Mr. Hubbard arrived the victim was in the master bedroom. The defendant said that he told the victim that he was leaving and verified that all of the bleeding had stopped. The defendant said that he and Mr. Hubbard dropped off his mother's car and then went to Mr. Hubbard's house and watched television and talked. The defendant said that he was not mad at the victim while he was at Mr. Hubbard's house, but he was hurt and was "cooling off."

The defendant testified that he arrived at home a little before 7:00 a.m. on January 27. The defendant said that his son left for school at around 7:30 a.m. The defendant said that he made a phone call to determine whether the victim's daughter went to school.

The defendant said that the victim was in bedroom number three when he arrived at the house. He said that he noticed that the sheets were off the bed in bedroom number two and that the victim had evidently put them in the laundry room. The defendant said that he asked the victim why she had changed beds, and she told him that the plastic on the bed in bedroom number two irritated her skin and made her legs start bleeding. The defendant said that he noticed that the victim had been bleeding but did not notice anything else about her condition. He said that he asked her once or twice how she was feeling and that she told him that she was okay.

The defendant said that he got into the bed with the victim and went to sleep. He said that he awoke around 10:00 a.m. and asked the victim how she was feeling. The defendant said that the victim told him that she was alright. He said that

24

he told the victim that he needed to go downtown and asked her if she wanted to go with him. He said that the victim declined and told him that she was going to take a bath and clean the house. The defendant said that he ran water for the victim's bath. He said that he did not see the victim walking to or getting into the tub, but he said that he knows she got into the tub.

The defendant said that he returned to the bathroom and saw the victim lying in the bathtub. He said that he called her name several times, and she moaned a couple of times. The defendant said that he ran into the kitchen, called 9-1-1, and followed the instructions he received. He said that he picked up the victim and may have fallen with her once or twice as he dragged her into the hall.

The defendant said that he called his sister after the 9-1-1 call and told her to come to his house. The defendant said that his sister followed the ambulance to the hospital. He said that his sister called him from the hospital and notified him that the victim had died.

The defendant testified that he did not intend to kill or harm the victim. He said that he did not kidnap the victim, and he insisted that none of the victim's cuts were caused by a knife. The defendant explained that he cleaned up the glass from the broken ashtray with a broom and dustpan. He said that he put the broom in the kitchen and the glass in the kitchen garbage can.

During cross-examination, the defendant testified that he dropped off the victim at her home on Sunday morning, January 26, 1992. He said that the victim did not spend Saturday night at her house. He admitted that he called the victim several times on Sunday but explained that he called her because he loved her, not because they were having a disagreement.

25

The defendant denied looking into the ladies room at the Chelsea Inn for the victim. He explained that he had Skeet drive him when he returned to the Chelsea Inn because the defendant's license had been suspended for six months and he was not supposed to be driving. The defendant said that Skeet died in his sleep in 1992, and his real name was Walter Calvin. The defendant said that the victim entered through the passenger door of his mother's car and sat in the backseat. The defendant said that the victim did not cut herself while she was in the car and that he did not know how blood got on any items in the car. The defendant said that he heard the sound of a car backfiring as they left the parking lot.

The defendant testified that he did not notice any cuts on the victim's legs until his second altercation with her. He said that during the second fight, the victim told him she cut her leg. The defendant stated that he saw the victim wearing his shorts and shirt before the second fight, but he did not notice any blood on her legs before the second fight. The defendant admitted that he squeezed the victim, but he said that he did not feel any of her bones break. The defendant said that he fell on top of the victim while he and the victim were fighting but that he never hit the floor. He said that he did not receive any injuries during the victim's attacks on him.

The defendant denied hitting the victim with a broom handle. The defendant acknowledged that there were donut-shaped weights lying loose in the floor of his weight room, but he denied pounding the victim's ribs with the weights. The defendant testified that he did not tell the victim that he was going to spend the night with Mr. Hubbard, and he said that he did not plan to stay with him. The defendant acknowledged that he had two Rottweilers in a kennel behind his house and that it was possible to let the dogs out into the fenced yard around his house.

The defendant said that when he found the victim lying in the bathtub he ran to the kitchen to call 9-1-1, although a bedroom telephone may have been closer. The defendant testified that he told the 9-1-1 operator that he thought that the victim was dying. He said that he did whatever he was told to do during the call, but he could not remember whether he checked the victim's pulse. He admitted that the telephone in the kitchen would not reach the victim and that there was no way he could have checked the victim's pulse while he was standing in the kitchen. The defendant listened to a portion of the 9-1-1 tape in which the paramedic told the defendant to place his fingers on the victim's neck and to move them down about half way. The defendant replied, "Uh-huh," and the paramedic asked whether he felt a pulse, and the defendant said that he did not. The defendant admitted that he was in the kitchen during the conversation with the paramedic and said that he did not know why he responded to the paramedics questions the way he did. He said that he just wanted the paramedics to arrive. The defendant explained that if he did not run to the victim when he told the paramedic that she did not have a pulse, he went to the victim later.

According to the 9-1-1 tape, when the defendant informed the paramedic that the victim did not have a pulse, the paramedic instructed the defendant how to do CPR. The paramedic told the defendant to cover the victim's mouth with his mouth and to blow out a breath. The defendant immediately told the paramedic that he did, and the paramedic asked whether the victim's chest rose. The defendant told the paramedic that it did. After listening to this portion of the tape, the defendant admitted that he evidently did not go to the victim the first time the paramedic asked him to do CPR. The defendant said that he did not know why he told the paramedics that he had tried to perform CPR when he had not done so.

In the next portion of the tape, the paramedic told the defendant to try to perform CPR again. There was a pause, and the defendant told the paramedic that the

victim's chest did not rise.  The defendant testified that he went to the victim's body during the pause.

The defendant testified that at the time of the victim's death, he did not know how she died.  He said that he thought she had passed out and that he did not think he caused her death.  The defendant remembered speaking to Lieutenant Goodwin on the scene, but he denied making the statement, "Nothing I did to her would have killed her."  The defendant also denied telling Lieutenant Goodwin that he called an attorney before police arrived on the scene.  The defendant explained that he did not call an attorney until the third person arrived and would not allow him to go to the hospital.

Roy Lee Calvin testified.  He said that his brother Walter Calvin, who was also known as Skeet, died on July 25, 1992.  A copy of the death certificate was introduced into evidence.

The defendant's sister, Donna Clayton Scott, testified that the defendant called her between 10:30 a.m. and 11:00 a.m. on January 27, 1992.  She said that she went to the defendant's house and talked to an officer.  She said that she saw the victim being brought out of the house and placed into an ambulance.  She said that she heard the defendant tell her to follow the ambulance, and she did.  She said that she called the defendant from the hospital and told him that the victim had died.

I

In his first issue, the defendant challenges the sufficiency of the convicting evidence.  Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

28

crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978).

Second degree murder requires proof that the defendant committed an unlawful, knowing killing. T.C.A. §§ 39-13-201(a) and -210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

When viewed in the light most favorable to the state, the proof at trial showed that the defendant severely beat the victim, causing her death. The defendant and another man picked up the victim at the Chelsea Inn shortly before 1:00 a.m. on the morning of her death. The defendant took the victim to his house where they fought. The defendant admitted that he and the victim fought and that he grabbed her, squeezed her, slung her to the floor several times, and fell on top of her. The victim suffered multiple blows to her arms, legs, abdomen, and back. The victim's arms were broken, three of her ribs were fractured, and her liver was punctured. Some of the victim's bruises had a donut-shaped pattern, similar to the weights found in the defendant's weight room. Others had a rod-shaped pattern, indicating that the victim had been struck with something similar to a broom handle. These recognizable patterns were a minor part of the victim's injuries which consisted of deep bruising without any specific pattern. The victim also had cuts on her legs and feet.

Dr. Hnilica testified that the victim died from multiple blunt force injuries. She said the injuries inflicted on the victim would have been painful and that she would not expect the victim to remain conscious for nine hours after they were inflicted. Dr. Hnilica explained that in her opinion the injuries to the victim's arms were not caused by the victim falling but rather by force being applied perpendicular to the bones. She explained that the injuries would have become more painful as the swelling of the victim's arms increased, making it unlikely that the victim would have lowered herself into a bathtub. The defendant called 9-1-1 after the victim was in the bathtub. During the 9-1-1 call, he told a paramedic that he was checking the victim's pulse when he was not. He also told the paramedic that he had attempted CPR when he had not. We believe that the jury was justified in concluding beyond a reasonable doubt that the defendant knowingly killed the victim.

## II

The defendant contends that his rights were violated because the medical examiner failed to comply with T.C.A. § 38-7-106, the statute authorizing autopsies by county medical examiners. The state contends that the medical examiner complied with the statute. We agree.

In relevant part, T.C.A. § 38-7-106 states:

> (a) a county medical examiner may perform or order an autopsy on the body of any person in a case involving a homicide, a suspected homicide, a suicide, a violent, unnatural or suspicious death. When the county medical examiner decides to order an autopsy, the county medical examiner shall notify the district attorney general. The district attorney general may order an autopsy in such cases on the body of a person in the absence of the county medical examiner or the failure of the county medical examiner to act. The authority ordering the autopsy shall notify the next of kin about the impending autopsy if the next of kin is known or reasonably ascertainable. The sheriff or other law enforcement agency of the jurisdiction shall serve process containing such notice and return such process within twenty-four (24) hours.

(Emphasis added). The defendant argues that the medical examiner and the state failed to comply with this statute because a law enforcement officer requested the autopsy, instead of the district attorney general. However, the plain language of the statute authorizes the county medical examiner to perform or order an autopsy in any case involving a suspected homicide. The fact that a medical examiner learns of a suspected homicide from law enforcement personnel does not affect the examiner's authority to conduct an autopsy. The issue is without merit.

### III

The defendant contends that the trial court erred by failing to instruct the jury on the lesser included offense of criminally negligent homicide. He argues that a criminally negligent homicide instruction was warranted because there was evidence at trial that indicated that he did not intend to hurt or kill the victim. The state contends that the proof at trial did not support an instruction on criminally negligent homicide. We hold that the trial court erred by failing to instruct the jury on criminally negligent homicide, but we conclude that the error is harmless beyond a reasonable doubt.

The trial court instructed the jury on premeditated first degree murder, felony murder, and the lesser included offenses of second degree murder and voluntary manslaughter. The defendant requested an instruction on criminally negligent homicide, but the trial court denied the request, stating that, at most, the proof showed voluntary manslaughter.

Pursuant to T.C.A. § 40-18-110(a), a trial court is required "to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." When the evidence, introduced by either the state or the defendant, is susceptible of inferring guilt of either a lesser grade or lesser included offense, the trial court has a mandatory duty to charge such lesser offense.

31

See T.C.A. § 40-18-110(a); State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996);

Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Howard, 926 S.W.2d

579, 585-86 (Tenn. Crim. App. 1996). Criminally negligent homicide is a lesser

included offense and a lesser grade of first degree murder. See State v. Lynn, 924

S.W.2d 892, 899 (Tenn. 1996); Trusty, 919 S.W.2d at 311.

In Strader v. State, 210 Tenn. 669, 679, 362 S.W.2d 224, 228-29 (1962),

our supreme court explained how the trial court should determine the need for a lesser

included offense instruction. It stated that "where the evidence, upon any view the jury

may take of it, permits an inference of guilt as to such lesser included offenses, it is the

mandatory duty of the Trial Judge to charge all the law as to each of the offenses, and

a failure to do so requires a reversal and a new trial." Id.; see also State v. Boyce, 920

S.W.2d 224, 226 (Tenn. Crim. App. 1995). In effect, the trial court must consider the

evidence in the light most favorable to the existence of the lesser included offense and

if the evidence so considered permits an inference of guilt of the lesser included

offense, the trial court must give instructions as to that lesser offense. Otherwise, the

trial court's consideration of the evidence runs the risk of invading the province of the

jury relative to witness credibility, the weight and sufficiency of the evidence, and the

degree of the offense, if any, to be sustained.

When deciding whether to give an instruction on a lesser included

offense, a trial court must consider all the evidence presented at trial, including the

defendant's testimony. This is true even if the defendant's testimony is unpersuasive or

uncorroborated. See Howard, 926 S.W.2d at 586; State v. Summerall, 926 S.W.2d

272, 279 (Tenn. Crim. App. 1995); State v. Ruane, 912 S.W.2d 766, 783 (Tenn. Crim.

App. 1995). If a defendant's version of events is susceptible to an inference of guilt of a

lesser included offense, then the trial court must instruct the jury with respect to the

lesser included offense. Howard, 926 S.W.2d at 585-86.

32

In this case, the defendant testified that he did not intend to kill or harm the victim. Although he admitted that he and the victim fought, he testified that the fighting stopped when he noticed that the victim was bleeding. He said that he administered first aid to the victim and thought that he had stopped her bleeding. He stated that he left the victim at his house. He said that when he returned he noticed that the victim had been bleeding, but he did not notice anything else about her condition. The defendant testified that he asked the victim twice how she was feeling, and he said that both times the victim replied that she was okay.

The defendant testified that he got into bed with the victim and went to sleep. He stated that when he awoke he again asked the victim how she felt, and according to the defendant, the victim once more told him that she was alright. The defendant said that he ran water into the bathtub because the victim told him that she wanted to take a bath. The defendant stated that the victim got into the bathtub. He said that he found the victim lying in the bathtub and called her name several times. He testified that the victim groaned, and he called 9-1-1 and pleaded for help for the victim. The defendant said that while he was awaiting the arrival of the ambulance, he tried to perform CPR on the victim.

Milton Hubbard testified that the defendant was with him during the early morning hours on the day of the victim's death. He said that he took the defendant to the defendant's house around 7:00 or 7:10 a.m. Calvin Harris testified that he talked to the victim that morning, and she told him that everything was alright. Dr. Hnilica testified that none of the victim's injuries would have caused the victim to lose consciousness immediately. She said that the victim would have experienced a gradual loss of consciousness.

This evidence could support a verdict for criminally negligent homicide. Criminally negligent homicide occurs when criminally negligent conduct results in death. T.C.A. § 39-13-212(d). Pursuant to T.C.A. § 39-11-302(d), "criminal negligence" is defined as follows:

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

If the jury believed the defendant when he testified that he did not intend to kill the victim, they could have concluded that he acted with criminal negligence by failing to appreciate the seriousness of the injuries he inflicted on the victim and failing to recognize the risk of death that was present.

The defendant's testimony raised a factual issue with respect to his mens rea, and the trial court should have submitted the issue to the jury. As this court noted in Ruane:

> "However plain it may be to the mind of the Court that one certain offense has been committed and none other, he must not confine himself in his charge to that offense. When he does so he invades the province of the jury, whose peculiar duty it is to ascertain the grade of the offense. However clear it may be, the Court should never decide the facts, but must leave them unembarrassed to the jury."

912 S.W.2d at 783 (quoting Poole v. State, 61 Tenn. 288, 294 (1872)).

Having determined that the trial court erred by failing to give a criminally negligent homicide instruction, we must now determine the effect of the error. This court has stated that error associated with the trial court's failure to instruct a lesser included offense is harmless when the jury finds the defendant guilty of a greater

34

offense and declines to convict the defendant of other lesser included offenses that were instructed by the trial court and that are greater offenses than the one requested. See State v. Atkins, 681 S.W.2d 571, 577 (Tenn. Crim. App. 1984); State v. Newsome, 744 S.W.2d 911, 915 (Tenn. Crim. App. 1987). But see State v. Belser, 945 S.W.2d 776, 791 (Tenn. Crim. App. 1996); Howard, 926 S.W.2d at 586-87; Summerall, 926 S.W.2d at 279; State v. Willie Williams No. 03C01-9510-CR-00330, Hamilton County (Tenn. Crim. App. Nov. 8, 1996), app. granted (Tenn. June 2, 1997).

Although the jury in this case was instructed on voluntary manslaughter, it chose to convict the defendant of the greater offense of second degree murder, which requires a knowing killing. Given the jury's refusal to convict the defendant of voluntary manslaughter and the overwhelming evidence of the defendant's guilt, including the proof concerning the number of injuries he inflicted on the victim and the severity of the victim's injuries, we believe that the trial court's failure to instruct the jury on criminally negligent homicide was harmless beyond a reasonable doubt.

**IV**

Next, the defendant contends that he received an excessive sentence. He contends that the trial court should have sentenced him as an especially mitigated offender. He also argues that the trial court improperly enhanced his sentence under enhancement factors provided in T.C.A. § 40-35-114. The state concedes that the trial court improperly applied enhancement factor (6), involving a victim suffering particularly great injury, and factor (10), regarding the commission of an offense with a high risk to human life. However, it argues that the trial court properly applied factor (1) based on the defendant's history of criminal behavior and properly applied factor (5) because the defendant treated the victim with exceptional cruelty. The state asserts that the trial court erroneously applied mitigating factor (11) provided in T.C.A. § 40-35-113 regarding the defendant's commission of an offense "under such unusual

35

circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." The state contends that the record supports the twenty-year sentence imposed by the trial court.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature

and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210 (1990); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the minimum in the range unless there are enhancement factors present. T.C.A. § 40-35-210(c) (1990).[1] Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e) (1990). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210 (1990), Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

The victim's mother was the only person to testify at the sentencing hearing. She testified concerning the victim's fear of the defendant a week before her death and about the effect the victim's death has had on her family.

The presentence report reflects that the defendant has a prior conviction for attempted larceny by trick, two prior convictions for driving on a suspended, revoked, or canceled license, and a prior conviction for violating the vehicle registration law. The report lists several other charges against the defendant that have been dismissed.

The trial court enhanced the defendant's sentence based upon his history of criminal behavior, his exceptionally cruel treatment of the victim, his infliction of

---

[1]For Class A felonies committed on or after July 1, 1995, the presumptive sentence is the midpoint of the range. See T.C.A. § 40-35-210(c).

particularly great injury on the victim, and his commission of an offense involving a high risk to human life.  See T.C.A. § 40-35-114(1), (5), (6), and (10).  With respect to mitigation, the trial court recognized the potential application of mitigating factor (11), regarding the defendant's commission of an offense under circumstances indicating that his conduct was not motivated by a sustained intent to violate the law.  However, the court refused to give the mitigating factor any weight.  The court stated:

> However, it was my feeling during the entire case that number eleven was your defense in this lawsuit.  It's always been your position that she died, but that you had no intent to kill her.  I guess, more or less, as a punishment after the episode as a result of what you say was this argument over the money situation in the betting of the Superbowl.  But, I do not believe that the mitigating factor outweighs, in any way, or diminishes the severity of what you did.

Initially, we disagree with the defendant's contention that he should have been sentenced as an especially mitigated offender.  A defendant can only be sentenced as an especially mitigated offender if the defendant has no prior felony convictions and there are applicable mitigating factors and no applicable enhancement factors.  T.C.A. § 40-35-109; see also State v. Hicks, 868 S.W.2d 729 (Tenn. Crim. App. 1993).  Because there are enhancement factors that are applicable in this case, the trial court properly sentenced the defendant as a Range I, standard offender.  See T.C.A. § 40-35-105.

Next, the defendant contends that the trial court improperly enhanced his sentence.  The state concedes that the trial court improperly applied factor (6), involving particularly great injury to a victim, and factor (10), relating to the commission of an offense with a high risk to human life.  However, the state contends that the trial court properly enhanced the defendant's sentence based upon his history of criminal behavior and his exceptionally cruel treatment of the victim.  See T.C.A. § 40-35-114(1) and (5).  The state argues that the trial court erred by applying mitigating factor (11) and

that the two applicable enhancement factors warrant the twenty-year sentence imposed by the trial court.

We agree with the parties that the trial court erred by enhancing the defendant's sentence based upon factors (6) and (10). Enhancement factor (6) does not apply to the defendant's sentence because particularly great injury to a victim is an essential element of second degree murder. See State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987). Similarly, the trial court erred by applying enhancement factor (10) to the defendant's sentence for second degree murder because the risk to human life is always high in a homicide case. Because there was "no risk to the life of a person other than the victim", factor (10) is inapplicable. State v. Bingham, 910 S.W.2d 448, 453 (Tenn. Crim. App. 1995).

The record supports enhancement of the defendant's sentence based upon his history of criminal behavior. See T.C.A. § 40-35-114(1). The presentence report states that the defendant has a prior conviction for attempted larceny by trick, two prior convictions for driving on a suspended, revoked, or canceled license, and a prior conviction for violating the vehicle registration law.

We also agree with the trial court's application of enhancement factor (5) based on the defendant's treating the victim with exceptional cruelty. The defendant inflicted several cuts and multiple blunt force injuries on the victim. The victim suffered two broken arms, three fractured ribs, a punctured liver, and extensive internal hemorrhaging. Dr. Hnilica testified that none of the injuries would have immediately caused the victim's death. Instead, the victim suffered for hours until she lost consciousness.

With respect to mitigation, the defendant contends that his sentence should be reduced because he "committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." See T.C.A. § 40-35-113(11). The state counters that the trial court erred by applying factor (11). In support of its argument, the state cites State v. Joe Freeman Norman, No. 01C01-9302-CR-00056, Wilson County (Tenn. Crim. App. Sept. 30, 1993).

In Norman, the defendant and a companion were rubbing and petting each other and were drinking while they were driving around in a car. The car struck a guardrail, and the defendant's companion was killed. This court refused to apply factor (11) to the defendant's sentence for reckless homicide because the defendant was in control of or at least helped create the circumstances that led to the victim's death.

We likewise disagree with the application of mitigating factor (11) in this case. The defendant contends that he never intended to hurt the victim and that he did not have a sustained intent to violate the law. However, the proof at trial demonstrated that the victim suffered numerous blunt force injuries and cuts. Also, the victim's daughter and Taneka Blackwell testified that they heard the defendant threaten to kill the victim two days before the victim's death. The victim's daughter also said that in the past the victim suffered bruises and busted ear drums while she was staying with the defendant. On the record before us, we cannot say that the crime was committed under unusual circumstances indicating that the defendant lacked a sustained intent to violate the law.

Given the two applicable enhancement factors and the absence of any mitigating factors, the record supports the twenty-year sentence imposed by the trial court. Thus, the sentence is affirmed.

**V**

The defendant contends that he received the ineffective assistance of counsel because his trial attorney failed to advise him of his rights, failed to preserve his rights, failed to investigate his case adequately, and failed to advise him about whether to accept any reasonable plea offer. The state counters that the defendant has failed to meet his burden of proof on the issue.

Although he had filed a motion to withdraw from representing the defendant, the defendant's trial attorney represented him during hearings on the defendant's motion for a new trial. The defendant's attorney told the court that the defendant felt that the attorney was ineffective for failing to obtain expert witnesses on the defendant's behalf, failing to challenge the chain of custody of the victim's body, and by failing to attack hearsay contained in an autopsy report. The trial court was hesitant to rule on the issue because it recognized the issue as being more appropriately raised in a post-conviction proceeding. However, the trial court overruled the portion of the defendant's new trial motion that challenged the effectiveness of trial counsel, stating that it "may" disagree with the petitioner based on its observations of the petitioner's counsel during trial. At the conclusion of the hearing, the trial court granted the attorney's motion to withdraw as counsel for the defendant relative to the appeal.

We agree with the state's assertion that the defendant has failed to meet his burden of proof relative to the claim that he had the ineffective assistance of counsel. However, we also note that the hearing which included this issue was conducted while the attorney who was the object of the claim continued to represent the defendant. Under these circumstances, we do not fault the defendant for the present state of the record. Be that as it may, however, the record before us does not warrant a

conclusion that the defendant's trial attorney rendered the ineffective assistance of counsel.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
David H. Welles, Judge


_____
Jerry L. Smith, Judge